# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-CA-00478-COA

**BRITT VIRDEN**                                                    **APPELLANT**

**v.**

**CAMPBELL DELONG, LLP, HAROLD H.**                    **APPELLEES**
**MITCHELL, JR., ROBERT N. WARRINGTON,**
**P. SCOTT PHILLIPS, BRADLEY F.**
**HATHAWAY AND FRANK G. POWER**

DATE OF JUDGMENT:              11/10/2020
TRIAL JUDGE:                   HON. BARRY W. FORD
COURT FROM WHICH APPEALED:     WASHINGTON COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:        PHILIP MANSOUR JR.
ATTORNEYS FOR APPELLEES:       DAVID W. MOCKBEE
                               DAVID WESLEY MOCKBEE
NATURE OF THE CASE:            CIVIL - CONTRACT
DISPOSITION:                   AFFIRMED - 09/27/2022
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**EN BANC.**

**McCARTY, J., FOR THE COURT:**

¶1.    A partner voluntarily withdrew from his law firm weeks after obtaining a multi-million-dollar settlement.  Despite receiving a large payout, the lawyer later sued for more. He alleged the firm did not follow his contract, resulting in an incorrect calculation of what he was owed.  The law firm filed a motion for declaratory judgment that it did not owe any further amounts, which the trial court granted.  Aggrieved, the lawyer now appeals.

## FACTS

¶2.    Britt Virden is an attorney, and for nearly a quarter century, he practiced law in

Greenville with Campbell Delong LLP. In 2001, Mr. Virden and the other partners of the law firm executed an Amended and Restated Memorandum Agreement. The purpose of the Agreement was to "govern the withdrawal, termination or retirement of any of [the partners] from the Partnership." All the partners signed the Agreement.

¶3.    While he was a partner at the firm, Mr. Virden worked on a case for a client who sought damages stemming from the Deepwater Horizon oil spill. The claim was successful, and in 2018 Mr. Virden emailed his partners about the BP settlement's result:

> After 5 years I finally completed the large BP claim for Producers Rice Mill. As with most BP claims the final amount less than originally calculated but eligibility award totaled $12,344,583. The attorneys fee from that is $3,085,002 which will be deposited today. . . . Since this is an extraordinary attorney[]s fee I want to go ahead and disburse the funds.

In the same email, Mr. Virden suggested the firm pay a bonus to each staff member and associate, pay off a bank loan, and deposit some money into a profit-sharing plan.

¶4.    The very end of the email contained what seemed to be an unremarkable suggestion—"Balance to RBV (Mr. Virden's initials) as extra-ordinary draw in 2018." Yet a cursory review of the math behind this suggestion reveals the lawyer was asking the firm pay him a little over $2.8 million dollars—or 92% of the total fee recovered. In Mr. Virden's proposal, the other partners would receive very little despite the large settlement.

¶5.    Mr. Virden did not receive an immediate response from the other partners. He then asked the firm's bookkeeper to issue him a check for the $2.8 million. Several of the partners were out of town and had not had the opportunity to respond to Mr. Virden's

2

requests, and the rest of the firm successfully blocked Mr. Virden from withdrawing the money from the firm's bank account.

¶6.     The firm's allocation committee met to discuss the disbursement of the fee. The committee at first recommended Mr. Virden receive $1,700,000, but ultimately the committee allocated him $1,910,855. He received a check in this amount, which was just under 62% of the whole law firm's share.

¶7.     A month later, Mr. Virden gave notice he was withdrawing from the firm. Simultaneously, he delivered letters from several of the firm's clients notifying the firm that those clients were terminating their attorney-client relationship with the firm and would follow him to his new firm.

## PROCEDURAL HISTORY

¶8.     Mr. Virden then sued the firm and its partners alleging that he was entitled to more money from the BP settlement. The firm and its partners filed their answer and affirmative defenses, which included a motion for declaratory relief, a request to stay discovery, and a counterclaim. In the firm's motion for declaratory judgment, it sought a ruling that all of Mr. Virden's claims were encompassed by the Agreement.

¶9.     After a hearing, the trial court granted the motion for declaratory judgment from the bench. First the trial court pointed out that "it appears that in this particular case that this agreement had been in place since 2001" and "that when Mr. Virden withdrew from the firm, he was well aware of the agreement . . . ." The trial court further held, "Mr. Virden was

3

aware of what [the agreement] contained in it, that he received the benefits of it when he needed to, and he used it to his advantage on other occasion[s]." The trial court declared "that paragraphs 7, 12, 13 and 14 of that agreement," which addressed partnership withdrawal and compensation, controlled the outcome of the case. The trial court further held the agreement was enforceable and subsequently granted the firm's declaratory judgment.

¶10. Since the firm prevailed, the trial court instructed the law firm to prepare the order. However, the parties could not agree on the language in the order. As a result, both Mr. Virden and the firm submitted proposed orders mirroring the trial court's bench ruling. The trial court signed both orders, and both were then stamped filed by the circuit court clerk.

¶11. The order Virden drafted held that the trial court had jurisdiction over the parties, that the motion for declaratory judgment was granted, and that all discovery was stayed.

¶12. The order the law firm drafted was lengthier and more detailed but contained the same relief. The parallel order explained that the Agreement "sets forth [the law firm's] payment obligations to [Mr. Virden] upon [Mr. Virden's] withdrawal from [the firm] as more specifically set forth in paragraphs 7, 12, and 13 of the Agreement." The order further set out "[t]he Agreement's payment obligations in paragraphs 7, 12, and 13 are the only payment obligations that the [law firm] owed to Virden upon Virden's voluntary withdrawal from the Firm on March 7, 2019." This order also stayed all discovery.

¶13. The firm's drafted order declared the Agreement was enforceable, and "all monetary

claims asserted by Virden . . . are governed by the express terms of the parties' Agreement." "[P]er the express terms of the Agreement the only payment obligation that [the law firm] owes to Virden is the amount of Virden's Working Capital Account at the time of Virden's withdrawal from the Firm." Further, under the Agreement, "Virden is estopped from claiming entitlement to any monetary amount from the [law firm] for acts and/or events which occurred when Virden was a Partner in the Firm except to Virden's entitlement to the amount of Virden's Working Capital Account at the time of his withdrawal." Last, pursuant to "Paragraph 14 of the Agreement, Virden has a legal and binding contractual obligation to convey his entire interest in the Firm and in Campbell DeLong Properties, LLC, and in their respective assets to the Firm and Campbell DeLong Properties, LLC . . . ."[1]

¶14. Mr. Virden moved for the court to reconsider its ruling. The trial court conducted a hearing on the matter and denied the motion to reconsider. The former partner to the law firm appealed.

**STANDARD OF REVIEW**

¶15. The Court applies "a de novo standard of review to questions of law, including a motion for a declaratory judgment." *Smith v. Safeway Ins. Co.*, 301 So. 3d 104, 106 (¶11) (Miss. Ct. App. 2020). "A de novo standard of review is applied to questions of contract

---

[1] The firm's counterclaim was not ruled upon by the trial court. The trial court certified the declaratory judgment as final pursuant to MRCP 54(b); *see Sledge v. Grenfell Sledge & Stevens PLLC*, 263 So. 3d 655, 660 (¶10) (Miss. 2018) (noting although "the firm had an outstanding counterclaim that was not decided, the trial court entered a final judgment" according to MRCP 54(b)).

construction." *Epperson v. SOUTHBank*, 93 So. 3d 10, 16 (¶16) (Miss. 2012).

## DISCUSSION

¶16. The lawyer raises a series of issues on appeal, which can be grouped into four sections. His core argument is that the Agreement does not preclude him from seeking a larger share of compensation from the firm. Second, he argues his causes of action against the law firm were not barred by the 2001 Agreement, including his claims for unjust enrichment, conversion, and the duty of good faith and fair dealing. Third, he disputes the trial court's grant of declaratory judgment. Last, the lawyer claims declaratory judgment should not have been granted because discovery had not been conducted.

### I. The Agreement encompasses the entirety of the dispute.

¶17. Whether Virden can sue his former firm for equitable relief and related claims requires us first to determine the effect of the Agreement.

¶18. "This Court has held that a plaintiff asserting any breach-of-contract claim has the burden to establish: (1) the existence of a valid and binding contract, and (2) a showing that the defendant has broken, or breached it." *Watkins & Eager PLLC v. Lawrence*, 326 So. 3d 988, 991 (¶9) (Miss. 2021) (internal quotation marks omitted). "A breach is material when there is a failure to perform a substantial part of the contract or one or more of its essential terms or conditions, or if there is such a breach as substantially defeats [the purpose of the contract]." *Id*. (citation and internal quotation marks omitted).

¶19. At the outset, "[w]e generally apply a three-step analysis when reviewing contract

6

interpretation." *Martindale v. Hortman Harlow Bassi Robinson & McDaniel PLLC*, 119 So. 3d 338, 342 (¶9) (Miss. Ct. App. 2012). "The first step requires that we determine whether the contract is ambiguous." *Id*. "If it is not, we must accept the plain meaning of a contract as the intent of the parties." *Id*. (internal quotation marks omitted). "The mere fact that the parties disagree about the meaning of a provision of a contract does not make the contract ambiguous as a matter of law." *Id*.

¶20.     "If we cannot ascertain the contract's meaning and the parties' intent within the contract's four corners, we apply the canons' of contract construction." *Id*. (internal citation and quotation marks omitted). "If the meaning of the contract is still ambiguous, we turn to extrinsic evidence." *Id*. at (¶9).

### A.    Precedent typically binds lawyers to their firm contract.

¶21.     Three cases guide the outcome when a former partner of a law firm seeks to recover amounts beyond those set by contract. In *Martindale*, a partner was frustrated when the firm was spending large amounts of money pursuing a personal injury case in Texas, and "openly questioned and criticized the extent of these expenditures." *Martindale*, 119 So. 3d at 340 (¶2). He was so vocal with his grievances the law firm voted unanimously to expel him. *Id*. 340 (¶3). Just a few months after he was kicked out, the firm settled the case, receiving $7,655,000 in fees. *Id*. at 341 (¶4).

¶22.     The former partner sued to claim a share the fee. *Id*. at 340 (¶4). According to the terms of the firm's operating agreement, once a member was expelled, the remaining

7

members were "required to either (1) dissolve the company or (2) pay the terminated member $1,100 for each percentage point of membership interest owned." *Id*. at (¶3). After notifying Martindale of his expulsion, the members voted to pay him this minimal amount rather than dissolve the firm. *Id*. In accordance with the firm's operating agreement, the firm instead tendered a check for $19,800, which was equivalent to his eighteen-percent membership interest. *Id*. But Martindale refused to accept the check, alleging that the specified amount did not "reflect his fair share of the law firm." *Id*.

¶23. The firm subsequently sought declaratory relief, arguing it had fulfilled the terms of the contract. *Id*. at (¶1). Martindale counterclaimed, alleging he was entitled to the fair value of his membership interest, and was entitled to more than the $19,800. *Id*. at 340-41 (¶4). The trial court agreed with the firm, and summary judgment was entered. *Id*. at 340 (¶1).

¶24. On appeal, we considered whether "the operating agreement provided Martindale's exclusive remedy for payment after his expulsion." *Id*. at 341 (¶5). This Court first examined the law firm's operating agreement to determine if it was clear and unambiguous. We found it controlled the lawyers payment after his expulsion, and "the only reasonable interpretation of [the contract] is that the parties intended for these sections to provide a member's exclusive right to compensation upon his or her expulsion." *Id*. at 342 (¶12). Further, the Court found that "Martindale has not shown the other members of Hortman Harlow breached the law firm's operating agreement or failed to enforce it." *Id*. at 344 (¶17).

¶25. In conclusion, "the law firm enforced the contract as written, tendering Martindale

8

payment as contemplated by the operating agreement he freely entered." *Id*. The Court recognized the disparity and relatively small amount between what the lawyer received per the contract versus the $7 million fee. Nonetheless, "[w]hile Martindale's payout is meager in light of the large settlement after his expulsion, we find Martindale received what he initially bargained for under the firm's operating agreement." *Id*. at 344 (¶19).

¶26. Nor did it matter that Martindale believed some of the terms in his contract were ambiguous. For "[t]he mere fact that the parties disagree about the meaning of a provision of a contract does not make the contract ambiguous as a matter of law." *Id*. (internal quotation marks omitted).

¶27. The Supreme Court recently reached the same result in a similar case. Like the lawyer in *Martindale*, a former partner sued his old law firm, alleging wrongful termination and dozens of other claims. *Lawrence*, 326 So. 3d at 989 (¶1). The terminated attorney styled himself as a "whistleblower" who protested the firm's hiring and compensation practices. *Id*. at 990 (¶4). He alleged he was fired and expelled without any reason, and was not given notice before he was fired or "a chance to be heard." *Id*.

¶28. The law firm denied the claims and filed a motion to dismiss. *Id*. at (¶5). The circuit court declined, and the Supreme Court granted interlocutory review. *Id*. at 990-91 (¶7).

¶29. On appeal, the firm argued "the provisions at issue within its operating agreement were structurally unambiguous and authorized the firm to terminate any member . . . for any reason whatsoever." *Id*. at 991 (¶12). The Supreme Court examined the text of the

9

agreement and held the amended PLLC agreement was a valid and binding contract. *Id*. at 991 (¶10-12). In doing so, the Court held that "[i]t is a question of law for the court to determine whether a contract is ambiguous and, if not, enforce the contract as written." *Id*. at 992 (¶13). In regard to the disputed language between Lawrence and his former firm, the Court held "[t]he mere fact that the parties disagree about the meaning of a provision of a contract does not make the contract ambiguous as a matter of law." *Id*. (internal citations omitted).

¶30. The Court opined that the language of the agreement in dispute was "clear and understandable . . . this Court finds the contracts to be unambiguous." *Id*. at (¶14). Further, the Court reminded the parties that "[m]ere disliking of the operating agreement does not provide him with the right to avoid its application." *Id*.

¶31. The Court explained "it is undisputed that [Lawrence] had been a member of the limited-liability organization and had agreed to be bound by all provisions for years." *Id*. at (¶15). But, "dislike for the resulting action taken when these provisions were utilized offers no fodder for a cause of action." *Id*.

¶32. A third and final case hews closely to the unique facts at issue here. A three partner firm executed a new a partnership agreement "to address the division of fees in general and, more specifically, the division of fees and firm property in the event of death, disability, retirement, withdrawal of firm members, and/or dissolution of the firm." *Sledge v. Grenfell Sledge & Stevens PLLC*, 263 So. 3d 655, 657 (¶1) (Miss. 2018). The Agreement also

10

maintained a provision "for how fees would be handled in the event of the death, disability, retirement, or withdrawal of a member." *Id*. at 658 (¶4).

¶33.    One partner eventually withdrew. *Id*. at 657 (¶2).  He alleged being "forced" to withdraw "[d]ue to the intentional actions of [the other members], including harassment, false accusations, breach of good faith and fair dealings and threats of litigation directed toward [him][.]" *Id*. at 658 (¶6) (internal quotation marks omitted).

¶34.    As in *Martindale* and *Lawrence*, the Supreme Court looked to the plain language of the contract.  "[W]e must determine whether the contract is ambiguous, and if it is not, then it must be enforced as written." *Id*. at 664 (¶24) "In making that determination, the Court must review the express wording of the contract as a whole." *Id*. (internal quotation marks omitted).  The Court acknowledged that "the parties both submit that the contract is unambiguous, but they disagree about a particular provision." *Id*.  Nevertheless, "[t]he mere fact that the parties disagree about the meaning of a provision of a contract does not make the contract ambiguous as a matter of law." *Id*. (internal quotation marks omitted).  In sum, the Court concluded that "based on the wording of the contract, the parties intended for the dispute-resolution provision to be applicable in a case precisely like the instant one." *Id*. at (¶25).

### B.    Campbell DeLong's Operating Agreement is plain and unambiguous.

¶35.    Just as the courts in *Martindale*, *Lawrence*, and *Sledge* did, we must first examine the text of the contract that governs the relationship between the law firm and Mr. Virden.  The

11

first page establishes, "**NOW, THEREFORE, AND IN CONSIDERATION** of the mutual promises and covenants herein contained, the Partners agree that in the event of . . . withdrawal . . . of any of them from the Partnership, that the value of such Partner's interest in the Partnership shall be determined and purchased in accordance with the following terms and conditions . . . ." The trial court held that Mr. Virden had signed the contract in 2001.[2]

¶36.    At 17 pages long, the document is detailed, and in addition to addressing partnership withdrawals, governs their terminations, retirement, disability, death, and even what happens if a partner is asked to withdraw within 3 years after gaining firm membership. The law firm's Agreement specifically crafted a formula for the value of firm membership upon withdrawal.

¶37.    First, paragraph number 7 of the Agreement establishes a "Working Capital Account" for each lawyer in the firm, which in part determines compensation. In relevant part, "each Partner's monthly draw is determined by subtracting a certain percentage from such Partner's previous year's income from the Partnership and dividing by 12."

¶38.    Second, paragraph 12 of the Agreement explains the procedure when a partner withdraws.[3] In relevant part, it states, "the withdrawing Partner shall sell his or her entire

---

[2] There is no serious challenge by Mr. Virden that this was not a contract or that he did not sign it. During oral argument, counsel for Mr. Virden would not agree his client signed the document, but conceded before the trial court that Mr. Virden "signed an agreement" while maintaining that it somehow was "absolutely uncontrolling."

[3] It further states "[t]hat the sum shall be paid to the withdrawing Partner, at the option of the Partnership, over a three (3) year period in three (3) equal annual installments, without interest."

interest in the Partnership and the Partnership's assets for an amount equal to the withdrawing Partner's Working Capital Account." Crucially, this section of the Agreement details that a partner receives *only* the value of their Working Capital Account in the event of voluntary withdrawal.

¶39.    Third, paragraph 13 explains what happens to firm files when a partner withdraws. In particular, "[a]ll work being performed by the *withdrawing Partner* on all files and all matters handled by him shall be considered to be and shall be property of the Partnership, and shall not be considered to be files of or property of the withdrawing Partner." (emphasis added).

¶40.    Last, paragraph 14 requires a withdrawing partner to convey his interest back to the partnership.[4]

¶41.    The trial court held these four paragraphs controlled the entire case. No party seriously contests the reality that the Agreement is plain and unambiguous. According to the Agreement, in the event a partner withdraws, he received the value of the Working Capital Account. In this case, that amount was $25,000, which per the contract was to be paid over

---

[4] Paragraph 14 denotes "[o]n or before the date of withdrawal, the withdrawing Partner shall execute and deliver to the Partnership such documents as may reasonably be required to convey to the Partnership of all the withdrawing Partner's interest in the Partnership and the Partner's assets, and the Partnership shall cause the withdrawing Partner to be released from any personal liability on account of any personal guaranty(ies) of indebtedness and obligations of the Partnership . . . ."

a three-year period in equal annual installments.[5]

¶42. Paragraph 13 of the Agreement administers the $3 million fee. The BP settlement claim was received by the law firm *before* Mr. Virden voluntarily withdrew. Pursuant to the terms of the contract, all of the fees and expenses relating to the case "shall be property of the Partnership." Therefore it was within the firm's authority to apportion the fee amongst the firm.

¶43. As these terms are plain and unambiguous, in accordance with the Agreement, the only payment obligation the firm owed to the lawyer upon withdrawal was the amount of his Working Capital Account. In *Martindale*, the lawyer was tendered a check for $19,800, which we recognized could be seen as "meager in light of the large settlement" his firm later received, but was exactly "what he initially bargained for under the firm's operating agreement." *Martindale*, 119 So. 3d at 344 (¶19). Under paragraphs 7 and 12, Mr. Virden bargained for and was entitled to the contents of his Working Capital Account, which was $25,451.76.

¶44. The overlap between *Martindale*, *Lawrence*, *Sledge*, and today's case is significant. All four involved litigation between lawyers and their former law firms. All four men in the cases were partners or the equivalent. In all four, the partners were either terminated or withdrew from the law firms. The four cases all involve a contract or written agreement,

---

[5] While the firm tendered the checks per the Agreement, which required disbursement of the Working Capital Account via three annual checks, Mr. Virden never cashed them.

which were all found to be plain and unambiguous in their terms. And the respective contracts provided the sole remedies for the terminated or withdrawing partners.

¶45. Given this case mirrors those three, we are compelled to reach the same conclusion—that the Agreement is plain and unambiguous and must be enforced as written. The law firm followed the bargained-for Agreement, tendering the former law partner payment as contemplated by the Agreement he freely entered into. Mr. Virden voluntarily withdrew and the firm paid him in accordance with the clear terms of the agreement. As such, under the plain and unambiguous terms of the Agreement, the law firm acted as authorized by its Agreement, and absent any breach, Mr. Virden is not afforded any additional relief.

¶46. Paragraphs 7, 12, 13, and 14 are clear and unambiguous, and the firm's actions demonstrate they followed the terms of the Agreement. As a result, the trial court correctly entered declaratory judgment for the firm.

## II. The Agreement subsumes Mr. Virden's remaining causes of action.

¶47. Mr. Virden argues the Agreement lacks any provision waiving "possible torts, claims, causes of action, incidental or consequential damages or the equitable relief," so he should be able to sue. He also argues the law firm breached its implied duties of loyalty and good faith and faith dealing.

### A. Mr. Virden is not entitled to any additional equitable relief.

¶48. In *Martindale* we held "discretionary equitable relief is available under some

circumstances, but *not* when the underlying contract is clear and unambiguous, and there is no breach or other similar issue with enforcement." *Id.* at 343 (¶13) (emphasis added). Furthermore, "[a] party does not breach the implied covenant of good faith and fair dealing when the party 'took only those actions which were duly authorized by the contract." *Lawrence*, 326 So. 3d at 993 n.2 (quoting *Martindale*, 119 So. 3d at 345 (¶20)).

¶49.    As set out above, the Agreement is plain and unambiguous.  Pursuant to paragraphs 7 and 12, a voluntarily withdrawing partner is only entitled to the contents of his Working Capital Account.  The law firm did not breach the Agreement by following these terms.  Mr. Virden's remaining claims are dependent on the law firm having breached the Agreement, and so they cannot survive.

¶50.    Nor can the implied duties of loyalty and good faith and fair dealing survive, since as in Martindale, the partners "'took only those actions which were duly authorized by the contract.'" *Id.*  In accord with *Martindale*, any equitable claims based on the Agreement are subsumed by the contract itself and limited to the amount in the Working Capital Account.

### B.    Mr. Virden's unjust enrichment and implied-in-contract arguments are inapplicable.

¶51.    Mr. Virden claims the law firm was unjustly enriched by allocating funds he earned to other partners.  However, "[u]njust enrichment applies in situations where no legal contract exists . . . ." *Willis v. Rehab Sols. PLLC*, 82 So. 3d 583, 588 (¶14) (Miss. 2012).

¶52.    Here, the parties have a legal contract.  The law firm followed its terms.  Since Mr. Virden voluntarily withdrew, the Agreement set out how the value of the partnership was to

16

be calculated. The Agreement directs the amount of money a withdrawing partner receives, and that was the amount of money allocated to Mr. Virden by the law firm.

¶53. Mr. Virden further argues there is evidence of an implied contract for partner compensation "that controls the amounts paid to partners of Campbell DeLong on an annualized basis." Yet precedent establishes we will not look to equitable remedies when there is a contract between the parties. "With limited exceptions, persons enjoy the freedom to contract," yet "[w]hen they do, they are bound by the terms of their contracts." *Martindale*, 119 So. 3d at 344 (¶19) (internal quotation marks omitted).

¶54. Further,"[a] contract implied in fact—also referred to as a quasi-contract—is an obligation created by law, *in the absence of an agreement*, when and because the acts of the parties or others have placed in the possession of one person money under circumstances that in equity and good conscience he ought not to retain and which in justice and fairness belong to another." *Triangle Constr. Co. v. Fouche & Assocs. Inc.*, 218 So. 3d 1180, 1187 (¶20) (Miss. Ct. App. 2017) (emphasis added) (citation and internal quotation marks omitted). Because the parties had an express contract covering the payment to partners of withdrawal, we will not consider any arguments regarding an implied or quasi-contract for additional compensation. The express purpose of the Agreement was to "govern the withdrawal, termination or retirement of any of [the partners] from the Partnership." The facts of the case establish the law firm paid Mr. Virden exactly what he bargained for under the plain terms of the Agreement. *See Martindale*, 119 So. 3d at 344 (¶19) (holding that "persons enjoy the

17

freedom of contract," and when they enter into one, "they are bound by the terms of their contracts").

¶55. The separate opinion focuses on Virden's allegation there was an implied contract in addition to his written contract with the firm. Yet Mississippi law refuses to recognize such an arrangement. "As in physics, two solid bodies cannot occupy the same space at the same time, so in law and common sense, there cannot be an express and an implied contract for the same thing, existing at the same time." *Rives v. Ishee*, 335 So. 3d 1098, 1103 (¶26) (Miss. Ct. App. 2022) (quoting *Redd v. L & A Contracting Co.*, 246 Miss. 548, 556, 151 So. 2d 205, 208 (1963)). "This is an axiomatic truth." *Id*. Instead, "[i]t is *only* where parties do not expressly agree, that the law interposes and raises a promise," and we can recognize an implied contract. *Id*. (emphasis added).

¶56. The facts of this case do not present such a scenario. This is not a case about annual partner compensation, but about the interpretation of a written contract as regards a withdrawing partner. Once Virden voluntarily chose to withdraw from the firm, the *only* remedies available to him were those contained in the express terms of the Agreement.[6] Had he chosen to stay with the firm and file suit for more compensation, a dispute would not have been controlled by the express terms governing the compensation accorded a withdrawing

---

[6] The applicable provisions are paragraphs 12 (governing payment for a withdrawing partner's interest pursuant to the amount in their working capital account), 13 (agreeing that "all files and all matters handled by [the withdrawing partner] shall be considered to be and shall be property of the Partnership"), and 14 (requiring a withdrawing partner to convey his interest in the firm back to the other partners).

18

partner. But that is a hypothetical scenario we do not need to reach, as "the review procedure should not be allowed for the purpose of settling abstract or academic questions" since "we have no power to issue advisory opinions." *Gamma Healthcare Inc. v. Est. of Grantham*, 334 So. 3d 85, 87 (¶2) (Miss. 2022) (internal quotation marks omitted).

¶57. There are no missing terms or clauses from the firm's agreement, which contains a whole section entitled "WITHDRAWAL" covering in minute detail the various obligations and liabilities of a withdrawing partner. The exact sequence of events in this case is embodied in that document; it is only that Virden has refused to abide by the terms of the contract. But as the Supreme Court concluded in *Lawrence*, "[m]ere disliking of the operating agreement does not provide [a lawyer] with the right to avoid its application." 326 So. 3d at 992 (¶14). Therefore we find the Agreement contains the whole of the payment to which the withdrawing lawyer was entitled.

### C. Mr. Virden's remaining claims are barred by the Agreement.

¶58. Mr. Virden's remaining causes of action include conversion, breach of duty of care, and misrepresentation. Essentially Mr. Virden argues the trial court's interpretation of the Agreement places a bar to these claims. In his reply brief, Mr. Virden protests the Agreement "has no exclusive remedy clause or waiver of rights paragraphs that forces a partner at Campbell DeLong to waive legal rights[.]"

¶59. Mr. Virden cites to a case in support of his argument that the contract improperly limited his rights to recovery. *Turnbough v. Ladner*, 754 So. 2d 467 (Miss. 1999). The

student had signed a contract which limited his liability. *Id*. at 468 (¶2). In it, a diving student sued a scuba diving instructor after he was harmed so badly he was told by doctors that he would never be able to dive again. *Id*. at 468 (¶4). In striking down the limitation clause, the Supreme Court held, "[t]he law does not look with favor on contracts intended to exculpate a party from the liability of his or her own negligence although, with some exceptions, they are enforceable." *Id*. at 469 (¶7).

¶60. Unlike the diving contract in *Turnbough*, there is simply no exculpatory clause in today's Agreement. The student diver in that case was left stranded by the contract he signed. Here, Mr. Virden bargained-for and received specified benefits under the Agreement. His decision to sign the Agreement and benefit from it was his choice alone.[7]

¶61. Simply put, just because Mr. Virden may dislike the reality of the Agreement, once he withdrew, this does not provide him with the right to avoid its application. Since "dislike for the resulting action taken when these provisions were utilized offers no fodder for a cause of action." *Lawrence*, 326 So. 3d at 992 (¶15); *see also Delta Pride Catfish Inc. v. Home Ins. Co.*, 697 So. 2d 400, 404 (Miss. 1997) (holding "[w]here the contract is unambiguous, the parties are bound by the language of the instrument" (internal quotation marks omitted)).

---

[7] Counsel for the law firm was asked a hypothetical during oral argument, which inquired if claims arising outside the contractual relationship, such as slander, would be barred by the express terms of the Agreement. Counsel for the law firm conceded a claim for slander "would not be covered" by the contract.

20

### III. Declaratory judgment was a proper procedural route.

¶62. Mr. Virden next takes issue with the fact that the trial court resolved his claims via declaratory judgment. Mr. Virden argues the declaratory judgment order acted not to declare rights, but to dismiss them—akin to summary judgment.

¶63. Rule 57(a) of the Mississippi Rules of Civil Procedure states that "[c]ourts of record within their respective jurisdictions may declare rights, status, and other legal relations regardless of whether further relief is or could be claimed." Rule 57(a) goes on to state that "[t]he existence of another adequate remedy does not preclude a judgment for declaratory relief in actions where it is appropriate." MRCP 57(a).

¶64. Rule 57(b) identifies different types of cases where the court may make a declaration of rights. "The declaratory judgment procedure is particularly available in cases where an interested party seeks to determine his status under a 'written contract or other writings constituting a contract.'" *UHS-Qualicare Inc. v. Gulf Coast Cmty. Hosp. Inc.*, 525 So. 2d 746, 753 (Miss. 1987) (quoting MRCP 57(b)(1)). "The rule further provides that a contract may be construed either before or after there has been a breach thereof." *Id*. (internal quotation marks omitted); *see Bourn v. Tomlinson Inst. Inc.*, 456 So. 2d 747 (Miss. 1984) (granting declaratory judgment to construe a deed). The Court relied upon what was then the Comment to the rule:

> The two principal criteria guiding the policy in favor of rendering declaratory judgments are: (1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the

proceeding.

*Id*.[8]

¶65.	In another case, the Court stated "[a]mong the cases where a proceeding for declaratory judgment is most needed are those where there exists an actual dispute with respect to which the parties have a compelling need to know where they stand before entering a substantial financial undertaking." *White v. Gautier Util. Dist. Jackson Cnty. Rev. Bond* (*In re Validation of $7,800,000 Combined Util. Sys. Revenue Bond*), 465 So. 2d 1003, 1014 (Miss. 1985).

¶66.	In one recent case addressing declaratory judgment, a woman rear-ended a man in a car accident. *Smith v. Safeway Ins. Co.*, 301 So. 3d 104, 105 (¶1) (Miss. Ct. App. 2020). The dispute on appeal was over whether insurance covered the collision. *Id*. at (¶4). This Court found that it was permissible for "any person interested" to seek a declaratory judgment because "Rule 57 specifically provides for declaratory judgment to determine questions of contractual validity and interpretation." *Id*. at 1013 (internal quotation marks omitted).

¶67.	So express language of Rule 57 and precedent allows for the exact scenario that is presented to us here. The broad language applicable is that "[a]*ny* person interested" may seek a declaration of rights under a contract. MRCP 57(b)(1) (emphasis added).[9] The

---

[8]  The Official Comment to Rule 57 was deleted and subsequently replaced. The current Advisory Committee Note was adopted and became effective in 2014.

[9]  In this case, the firm sought only declaratory judgment and never filed a motion for summary judgment. Given the depth of the dispute between the parties, a clearer path would have been to file a motion for summary judgment, which requires "an itemization of the facts

22

express language of the Rule 57 provides for relief in situations just like this—when there is a contract dispute.[10]

¶68. Last, Mr. Virden attacks what he characterizes as "conflicting" orders by the trial court. At the end of the hearing where the trial court ruled it would grant declaratory judgment, counsel for the law firm was instructed to draft the order. Yet the parties could never agree on the language of the orders, and in the end, prepared two separate documents. The trial court subsequently signed *both* orders, which were in turn docketed and stamped filed by the circuit clerk.

¶69. It is this alleged discrepancy between the two orders which Mr. Virden protests. Yet both orders grant the same relief: the one prepared by counsel for Mr. Virden notes that the Court has jurisdiction, that declaratory judgment will be granted, and discovery will be stayed. While more detailed, the order prepared by the law firm contains the exact same relief, with the addition of a certification under MRCP 54(b) that judgment is final and a ruling that "the Agreement is enforceable as written." Furthermore, both orders can be read together, and do not contradict one another.

---

relied upon and not genuinely disputed" by the movant, and in turn "the respondent shall indicate either agreement or specific reasons for disagreement that such facts are undisputed and material." UCRCCC 4.02(2); *see* MRCP 56. In this case because no genuine issue of material fact is in dispute, declaratory judgment was proper under Rule 57.

[10] "We perceive that enough peace, if not good will, may be wrought by the present proceedings that the court ought to do what it can do to lay to rest what part of the controversy it can." *UHS-Qualicare Inc.*, 525 So. 2d at 753 (internal citation and quotation marks omitted).

23

¶70. As pointed out above, our standard of review is *de novo*, which means "we completely review the grant of summary judgment anew, or afresh, without deference to the trial court's ruling." *Stuart v. St. Dominic-Jackson Mem'l Hosp.*, 311 So. 3d 1192 at 1202 (¶47) (Miss. Ct. App. 2020). Having reviewed the two orders in detail, we conclude there is no conflict between the two documents, and certainly no conflict which would rise to the level of reversible error.[11]

### IV. The stay was not improper.

¶71. In Mr. Virden's last argument, he protests that the trial court tied his hands by staying discovery. In his briefing, Mr. Virden argued "[f]undamental fairness and opportunity for the court to consider both the claims and defenses dictate that the parties should be granted the opportunity to conduct discovery."

¶72. "Our standard of review of a trial court's management of the pre-trial discovery process is abuse of discretion." *Stuart*, 311 So. 3d at 1200 (¶35). Further, "[t]rial courts have inherent authority and duty to control their dockets for the orderly disposal of business." *Harris v. Fort Worth Steel & Mach. Co.*, 440 So. 2d 294, 296 (Miss. 1983).

¶73. Despite Mr. Virden's protests, a review of the docket sheet and the pleadings filed in the trial court below reveals he never propounded discovery. Following the filing of Mr. Virden's complaint, the law firm requested a stay in its answer filed September 2019. The

---

[11] Indeed, during oral argument before this Court, counsel for Mr. Virden agreed with this point, stating, "in reality I think they are probably both dispositive orders."

order granting the stay was filed in November of 2020—over a year later.

¶74.    During that time between the filing of his complaint and the order staying discovery, Mr. Virden never propounded discovery. Mr. Virden was had ample opportunity to conduct discovery. However, he chose not to. "[T]his Court has neither the prerogative nor the inclination to mire itself in the details of managing the pre-trial discovery process, which is properly left to the discretion of the trial court." *Stuart*, at 1201 (¶40) (internal citation omitted).

¶75.    The trial court did not abuse its discretion by staying discovery.

## CONCLUSION

¶76.    This is a case where a lawyer has sought to evade the terms of a partnership agreement. "The essence of the law partnership is the common conduct of a *shared* enterprise." *Hishon v. King & Spalding*, 467 U.S. 69, 79-80 (1984) (Powell, J., concurring) (emphasis added). Much of Mr. Virden's argument is devoted to why he should have received nearly the entire fee by himself, but this ignores that the firm was a shared enterprise governed by a contract to which he was bound.

¶77.    We hold the Agreement is plain and unambiguous; therefore, Mr. Virden is bound by its terms. Accordingly, the trial court's grant of declaratory judgment was proper, and there are no errors warranting reversal.

¶78.    **AFFIRMED.**

    **CARLTON, P.J., WESTBROOKS, McDONALD AND SMITH, JJ., CONCUR. WILSON, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY**

25

**BARNES, C.J., GREENLEE, LAWRENCE AND EMFINGER, JJ.**

**WILSON, P.J., DISSENTING:**

¶79. I agree with the lead opinion that the relevant provisions of the "Amended and Restated Memorandum Agreement" among the Campbell DeLong partners are essentially clear and unambiguous. However, I disagree that, as a matter of law, those provisions bar all of Virden's claims against his former law partners. Accordingly, I respectfully dissent.

¶80. The gravamen of Virden's complaint against his former law partners is his allegation that they breached an "implied agreement" or "implied contract" among the Campbell DeLong partners by allocating to themselves a share of a significant fee that Virden generated. Virden claims that for many years, Campbell DeLong had operated under an "implied agreement" or "implied contract for compensation of partners." Virden alleges that Campbell DeLong "has never operated as a traditional partnership" in which "partners share equally in all . . . profits" of the firm. Rather, he alleges that there is an "implied contract" that each partner is entitled to all income that he generates "less standardized amounts contributed to the law firm for operating expenses." "In short," Virden says, "all partners at Campbell DeLong have an accepted implied contract . . . whereby each partner 'eats what he kills' after payment of overhead expenses." Virden alleges that his former partners breached that implied contract by conspiring to take $1,385,000 that Virden brought in.

¶81. Virden's former partners dispute his account of Campbell DeLong's historical partner-compensation practices. They maintain that for decades the firm's partners have agreed that

26

a three-member "Compensation Committee" determines the amount of "compensation to be paid to each partner annually." They say that the Compensation Committee has broad discretion to make a "final determination" regarding partner compensation "based on many objective and subjective factors." They assert that Virden "agreed to be bound by the Compensation Committee's final determination when he became a [p]artner at the [f]irm in 2000." Thus, they contend that Virden was "contractually bound to accept the [amount] allocated to him by the Compensation Committee." Virden's former partners deny that they breached any implied contract. Indeed, they allege that Virden breached the partners' implied contract by demanding more than the Compensation Committee allocated to him.

¶82. Thus, the parties rely on competing historical accounts of an implied contract among Campbell DeLong's partners. The parties agree that the firm has no written contract regarding annual partner compensation or allocation of the firm's profits.[12] By its terms, the purpose of the firm's "Amended and Restated Memorandum Agreement" is only "to govern the withdrawal, termination or retirement of [partners] from the [firm]." That Agreement does not address annual compensation or even mention the Compensation Committee.[13]

---

[12] A partnership agreement "may be implied, or established from the surrounding circumstances." *Smith v. Redd*, 593 So. 2d 989, 994 (Miss. 1991). "[A]lthough the existence of an actual written partnership agreement certainly is quite probative and useful, it is not necessary. A partnership may exist as an oral or written, express or implied agreement among its members." *Century 21 Deep S. Props. Ltd. v. Keys*, 652 So. 2d 707, 715 (Miss. 1995) (quotation marks omitted).

[13] During oral argument, counsel for the firm and its remaining partners agreed that the written Agreement was not an "operating agreement" and that the firm does not have a written operating agreement.

27

¶83. For this reason, the lead opinion misses the mark by invoking the rule that "there cannot be an express and an implied contract for the same thing, existing at the same time." *Rives v. Ishee*, 335 So. 3d 1098, 1103 (¶26) (Miss. Ct. App. 2022) (quoting *Redd v. L & A Contracting Co.*, 246 Miss. 548, 556, 151 So. 2d 205, 208 (1963)). For one thing, the lead opinion's reliance on this rule is contrary to the positions taken by both Virden and his former law partners. Again, *both* Virden *and* his former law partners maintain that the firm had an implied contract regarding annual partner compensation. The parties agree that such an implied contract *existed*. They only disagree regarding its substance. Moreover, the only written contract at issue in this appeal—the "Amended and Restated Memorandum Agreement"—simply does not address the subject of annual partner compensation.[14] That is, the written contract does not address "the *same thing*" as the alleged implied contract. *Id.* (emphasis added). Accordingly, the existence of the written contract does not bar Virden's claim regarding an implied contract. *See* 17 C.J.S. *Contracts* § 16 (updated Sept. 2022) ("An implied agreement is precluded *only* where the express and the asserted implied contract relate to the *same subject matter* . . . ." (emphasis added)).

¶84. Nonetheless, the circuit court held that the written Agreement "resolves all of [Virden's] claims" against his former partners. In particular, the circuit court pointed to

---

[14] I do not understand how the lead opinion can assert that "[t]his is not a case about annual partner compensation . . . ." *Ante* at ¶56. The gravamen of Virden's complaint is that his then-partners breached their implied-in-fact contract regarding annual partner compensation by paying him less than he was due for the 2018 calendar year.

28

sections 12 and 13 of the Agreement, which in relevant part provide as follows:

12. **Payment for Withdrawing Partner's Interest.** . . . [I]f any Partner shall voluntarily withdraw from the Partnership for any reason except death, disability or retirement from the active practice of law, the remaining Partners shall continue the Partnership without interruption and without the necessity of any accounting and the withdrawing Partner shall sell his or her entire interest in the Partnership and the Partnership's assets for an amount equal to the withdrawing Partner's Working Capital Account. . . . .

13. **Files.** All work being performed by the withdrawing Partner on all files and all matters handled by him shall be considered to be and shall be property of the Partnership, and shall not be considered to be files of or property of the withdrawing Partner. . . .

The argument is that Virden's claims are barred because, in effect, Virden's complaint seeks to recover more for his "entire interest in the Partnership and the Partnership's assets."

¶85. I cannot agree that Virden's complaint solely or primarily seeks to recover a greater amount for his "interest in the Partnership and the Partnership's assets." Virden's primary claim is that his former partners breached their implied contract with him when they conspired to allocate to themselves a share of a significant fee that Virden had generated. As discussed above, Virden alleges that this allocation departed from the parties' implied partnership agreement. A partner may maintain an action against another partner for breach of the partnership agreement. Miss. Code Ann. § 79-13-405(b)(1) (Rev. 2013). Such a claim does not seek to recover the value of the partner's "interest in" the firm or its assets. It is essentially a simple breach-of-contract action against another partner. That is the core claim that Virden makes in his complaint—he seeks to recover damages based on his allegation that his former partners breached their implied partnership agreement when they took a share

29

of a fee that he earned.

¶86.    For this reason, the lead opinion's reliance on *Martindale v. Hortman Harlow Bassi Robinson & McDaniel PLLC*, 119 So. 3d 338 (Miss. Ct. App. 2012), is misplaced.  In that case, an attorney who had been expelled from a law firm asserted a claim against the firm for "the fair value of his membership interest" in the firm.  *Id.* at 340-41 (¶¶3-4).  This Court held that the firm's written operating agreement barred the claim because the agreement "provide[d] a member's exclusive right to compensation upon his or her expulsion." *Id.* at 342 (¶12).  The attorney could not assert a claim for the "fair value" of his interest in the firm because the "operating agreement specifically provided a formula to determine [the value of] an expelled member's interest." *Id.* at 344-45 (¶¶20-21).  We specifically noted that the attorney "ha[d] not shown the other members of [the law firm had] breached the law firm's operating agreement or failed to enforce it." *Id.* at 344 (¶17).

¶87.    In contrast, the primary basis of Virden's complaint is that prior to his withdrawal, his former partners breached the firm's implied partnership agreement.  On that claim, Virden does not seek a payment for the "fair value" of his interest in the firm.[15]  Rather, he seeks to recover damages that allegedly resulted from a specific breach of contract by his former law partners.  Such a claim is not barred by paragraph 12 of the Agreement, which only defines

---

[15] Like many complaints, Virden's complaint ultimately asserts a litany of legal claims based on the same set of factual allegations.  Among his claims, Virden asserts a demand for "compensation and payment" for his "equity interest in [the] law firm." That particular claim is barred by the terms of the written Agreement.

30

a withdrawing member's right to compensation for his interest in the firm and its assets.

¶88.    The other two cases relied on by the lead opinion, *Sledge v. Grenfell Sledge & Stevens PLLC*, 263 So. 3d 655 (Miss. 2018), and *Watkins & Eager PLLC v. Lawrence*, 326 So. 3d 988 (Miss. 2021), are similar to this case only in that they involved lawyers who had withdrawn from or been expelled by their respective law firms.  In *Sledge*, the Supreme Court held that a lawyer who withdrew from his firm was bound by a provision of the firm's partnership agreement that stated, "Any dispute or decision related to this agreement or partnership shall be settled by a majority vote of the partners." *Sledge*, 263 So. 3d at 662-64 (¶¶17-26).   Therefore, the withdrawing partner was bound by the remaining partners' decision regarding his rights to fees from cases existing at the time of his withdrawal.  *See id.* at 657-60 (¶¶1-9).  In *Lawrence*, a lawyer challenged his expulsion from his law firm, arguing that he was expelled for improper reasons and did not receive adequate notice or an opportunity to be heard.  *Lawrence*, 326 So. 3d at 990 (¶4).  But the Supreme Court held that the firm's operating agreement unambiguously permitted the firm to expel a partner for any reason or no reason at all based on the written consent of a sufficient number of its members. *Id.* at 991-92 (¶¶9-15).  Thus, in both *Sledge* and *Lawrence*, the Court simply enforced unambiguous provisions of the operating agreements at issue in those cases.  Beyond the fact that those cases also involved disputes among lawyers, they have little in common with the present case.

¶89.    Unlike *Sledge* and *Lawrence*, the relevant terms of Campbell DeLong's written

31

Agreement do not bar all of Virden's claims against his former partners. Paragraph 12 of the Agreement only serves to establish the amount of compensation that a withdrawing partner is entitled to be paid for his "entire interest in the Partnership and the Partnership's assets." It does not bar a withdrawing partner from suing his former partners for damages for an alleged breach of a separate implied contract. Stated differently, the gravamen of Virden's complaint is not a demand for payment for the value of his interest in the firm; rather, Virden's primary claim is that his former partners breached their implied contract by causing the firm to pay them funds they were not entitled to receive. Accordingly, I respectfully dissent from the lead opinion's determination that the Agreement bars all of Virden's claims against his former partners.

**BARNES, C.J., GREENLEE, LAWRENCE AND EMFINGER, JJ., JOIN THIS OPINION.**